# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **CHRISTIAN HERITAGE ACADEMY,** <br> a private Corporation, <br><br> Plaintiff, <br><br> vs. <br><br> **OKLAHOMA SECONDARY SCHOOL** <br> **ACTIVITIES ASSOCIATION,** <br> a not-for-profit Association, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

CASE NO. CIV-2003-0056-L

**FILED**

DEC 0 5 2003

ROBERT D. DENNIS, CLERK
U.S. DIST. COURT, WESTERN DIST OF OKLA.
BY_____ DEPUTY

---

## PLAINTIFF CHRISTIAN HERITAGE ACADEMY
## MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT (WITH APPENDIX)

---

**WILLIAM D. (BILL) GRAVES**  OBA #3542
200 N. Harvey, Suite 500
Oklahoma City, OK 73102
Phone: (405) 235-5811
Fax: (405) 236-4114

**MICHEAL SALEM**  OBA #7876
*Salem Law Offices*
111 North Peters, Suite 100
Norman, Oklahoma 73069
Phone: (405) 366-1234
Fax: (405) 366-8329

**CHRIS BOX**  OBA #2604
2208 S.W. 59
Oklahoma City, OK 73119
Phone: (405) 682-5544
Fax: (405) 682-5563

ATTORNEYS FOR PLAINTIFF
CHRISTIAN HERITAGE ACADEMY

**December 5, 2003**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CHRISTIAN HERITAGE ACADEMY,**<br>a private Corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CASE NO. CIV-2003-0056-L** |
| | ) | |
| **OKLAHOMA SECONDARY SCHOOL**<br>**ACTIVITIES ASSOCIATION,**<br>a not-for-profit Association, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF CHRISTIAN HERITAGE ACADEMY'S
## <u>MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT</u>

Plaintiff Christian Heritage Academy (CHA) submits the following *Motion and Brief in Support of Summary Judgment.*

## A.  INTRODUCTION

By state constitution and statutory design the public education system is open to all citizens of the State of Oklahoma.[1]   However, despite these constitutional and statutory designs, the activities programs of the secondary schools, are not.

These are not insignificant components of that public education system, the cooperative activities among the schools that include sports, academics, and artistic endeavors that broaden the educational background of students and bring focus on the benefit of competitive activities.

These competitive exercises have become such an significant component of the educational experience that schools have banded together to meaningfully coordinate and control

---

[1]   See Okla. Const., Art. 13, Sec. 1. ("The Legislature shall establish and maintain a system of free public schools wherein all the children of the State may be educated.")

the interaction of its members through an association known as the Oklahoma Secondary School Activities Association[2] (OSSAA).

Recognizing the value of variety and the need for coordination, the OSSAA has made it overwhelmingly easy for public and other governmental schools to join, requiring a simple request for membership and acknowledgement of agreement to abide by its rules.

However, the mission of education of our children is not left only to the public schools. Many parents and guardians, exercising their power of choice, have decided, whether in the exercise of sincere heartfelt religious conviction or the simple decision to find a significantly different experience for their children, to make private arrangements for the education of their children in nonpublic and mostly religious schools.[3]

Instead of embracing those organizations which meet the parallel responsibility of education, the OSSAA separates and isolates them.  The OSSAA requires that nonpublic nongovernmental schools submit to an election, a standardless gauntlet, before admission.  The successful private school must survive intuition, innuendo, and invective to become a member only to find itself still an expatriate after admission.

---

[2]   The term "public schools" will be used to refer to all public secondary school members of the OSSAA.  This will not include the governmental service Indian schools and the State Schools for the Deaf and Blind who are treated in an identical fashion to public schools for admission purposes under the Constitution of the Association. (App. 212-13)

The term "governmental schools" will be used to refer to all members of the OSSAA other than the ten nonpublic nongovernmental schools.  This will include the governmental service Indian schools and the State Schools for the Deaf and Blind.

The term "nonpublic schools" will used to refer to all members of the OSSAA other than the public secondary schools.  This will include the governmental service Indian schools and the State Schools for the Deaf and Blind.

The term "nongovernmental schools" will be used to refer only to the ten nonpublic nongovernmental school members.

[3]   This would include some of the participants to this proceed.  (See Bullard, App. 448; Merrill, App. 739)

Although bound to due process and equal protection, the OSSAA has chosen some private schools and rejected others. Several of the schools that have been accepted are very similarly situated to CHA making it increasingly difficult to discern why they were accepted and CHA excluded. If there are mechanisms to separate CHA from the several other nongovernmental schools who already enjoy OSSAA membership, they must be very fine tools indeed.

## B. STATEMENT OF THE ISSUES

I.  **THE OSSAA, AN ORGANIZATION OF SECONDARY GOVERNMENTAL SCHOOLS AND SOME NONPUBLIC SCHOOLS, IS A STATE ACTOR WITHIN THE MEANING OF 42 U.S.C. §1983.**

II. **DENIAL OF OSSAA MEMBERSHIP AND ITS BENEFITS TO OTHERWISE QUALIFIED NONGOVERNMENTAL SCHOOLS EXCEPT BY APPROVAL OF ASSOCIATION MEMBERS THROUGH A STANDARDLESS VOTE IS INCONSISTENT WITH DUE PROCESS AND EQUAL PROTECTION AS ARBITRARY AND CAPRICIOUS.**

III. **DENIAL OF OSSAA MEMBERSHIP AND ITS BENEFITS TO OTHERWISE QUALIFIED CHA WHILE MEMBERSHIP AND BENEFITS ARE GRANTED TO OTHER NONGOVERNMENTAL SCHOOLS SIMILARLY SITUATED VIOLATES EQUAL PROTECTION.**

IV. **UNDER UNCONTROVERTED FACTS IN THIS CASE, THE DEFENDANT OSSAA CANNOT PROVIDE A RATIONAL BASIS FOR ITS ACTIONS DENYING MEMBERSHIP TO CHA IN THAT CONCERNS OF OSSAA MEMBER INSTITUTIONS RAISED ABOUT CHA MEMBERSHIP ARE NOT VALIDLY RELATED TO LEGITIMATE ISSUES INVOLVING OSSAA ACTIVITY.**

## C. PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS

Plaintiff submits the following statement of facts which it believes are uncontroverted for purposes of summary judgment only, and which support Plaintiff's submitted claims:

ORGANIZATION OF THE OSSAA, MEMBERSHIP, AND ITS ROLE AS A STATE ACTOR:

3

1.     The Oklahoma Secondary School Association (OSSAA) is an association (noncorporate)[4] of governmental and private member schools. (App. 212-13 (Constitution))  Its purpose is to:

> Provide effective coordination, leadership, supervision, and regulation for secondary school activities including the program of interscholastic activities and contests in which its member schools may participate.

2.     The OSSAA has the following Mission Statement:

> The OSSAA will serve member schools by providing leadership in the development, supervision, and conduct of co-curricular activities, which enrich the educational experiences of high school students.  It will provide for equitable participation opportunities and positive recognition to students as a whole, while working cooperatively with schools to enhance the achievement of desired educational goals.

3.     The eligibility and requirements for membership are provided in the Constitution:

> a.     Membership in the Association shall be open to public schools under the supervision and direction of district boards of education, government Indian services schools, Oklahoma School for the Deaf, Oklahoma School for the Blind, and other schools as approved by the members of the Association.

> b.     Any secondary school desiring to become a member of the Association is to file with the Executive Secretary a resolution, adopted by the board of education or by the governing authority for the school applying for membership, authorizing such membership and directing the administrative head of the school to comply with the requirements for member schools.   Upon submitting the resolution, and all entry fees or other reports required by the Association, a public school, government Indian Service School, Oklahoma School for the Deaf and Oklahoma School for the Blind shall be admitted to membership.  **All other schools must be approved by a majority vote of existing membership and, if approved, must submit all entry fees and reports required to establish membership.** (App. 212)(emphasis added)

> c.     Associate membership in the Association may be granted secondary schools by the Executive Secretary.  Associate member schools may participate in all activities except Association sponsored athletic events leading to championships.     The

---

4    OSSAA is a true association.  There is no corporate form. (App. 18-19)

representative of an associate member school shall not have a vote
nor be eligible to hold office in the Association. (App. 212-13)

4.     Logically following the rules, each governmental school, which is a member of
the OSSAA, is a member by virtue of an official vote of its board of education. (App.
34, 212)

5.     The Board consists of fourteen directors with three elected from each quadrant
of the state representing every size school. One represents members who are from
districts with multiple schools. Another director is appointed by the Board or governing
authority. (App. 18, 213, 244) The only persons eligible to serve as directors are district
superintendents or assistant superintendents, principals or assistant principals, and
directors of secondary education schools for member schools. (App. 213-14)

6.     Danny Rennels is the Executive Secretary of the OSSAA. (App. 14) He is
responsible for overseeing the 32 different activities of the Association and conducts the
monthly board meeting. (App. 17-18, 25, 215)

7.     Administration of the Association in all its aspects and execution of decisions of
the Board is delegated to the Executive Secretary and Rennels is authorized to act on
behalf of the Board in its absence subject to appeal to the Board. (App. 22-23, 217)

8.     Meetings of the Board are subject to the Open Meeting Law of the State of
Oklahoma. (App. 214) They take place during the school day. (App. 59)

9.     All board members currently are from public schools. Each is a public school
employee. Rennels has no recollection of a representative from a private school seeking
membership on the Board. (App. 30, 32) A representative of the State Board of
Education attends Board meetings. (App. 31-33)

10.    The Constitution provides that only the high school principal or the superintendent
may be a voting member (App. 32, 213), but the official is not the member, rather it is
the individual school. (App. 33-34)

11.    The Association was originally started as an athletic activity coordinating body
by some school administrators to develop rules, establish the play off system, select who
will play whom and where. It may have been known as the Oklahoma High School
Athletic Association. (App. 28) In 1961 it became an activities association and included
both athletic and nonathletic activities, both girls and boys. (App. 26-27, 816)

12.    OSSAA does not establish school schedules, but does schedule championship
playoffs. (App. 27)

13.    Funding for the organization is provided by gate admissions charged to the public
at playoff tournaments and enrollment fees depending upon the activities which depend
upon the activities selected by the individual schools. (App. 51-52, 60-62, 816)

14.     Depending upon the application of formulas used to determine host status of a playoff game based upon a season finish, playoff games can occur on public school property. (Rule 14, Sections 5 - 6, App. 52-3, 235-36)

15.     For football playoff elimination games, the OSSAA shares revenue from the games with the participants.  The host school receives 50%, the visiting school receives 30%, and the OSSAA receives 20%.  If played on a neutral site, 70% is equally divided between the schools.  The OSSAA receives 30% of all neutral site games.  There are other methods of sharing revenue from the playoff elimination.  The OSSAA rules control the understanding, responsibility and division of receipts and expenses. (Rule 14, Sections 10 - 11, App. 236-37; App. 62-67)

16.     The OSSAA specifies the beginning and end of sports seasons for high school and junior high for football, basketball, wrestling, soccer, and other sports. (App. 237-41)

17.     The OSSAA controls the eligibility of all sports officials for regular season sports who must be registered with the OSSAA and undergo OSSAA training. (Rule 16, App. 241)

18.     The OSSAA retains broadcast rights of all elimination contests, games, tournaments or meets that lead to a state-wide championship sponsored by the Association.  (Rule 17, App. 241)

19.     The OSSAA has jurisdiction to sanction any All-Star Games held in the State of Oklahoma.  (Rule 18, App. 241)

20.     The OSSAA also controls rule waivers, approval of tournaments, meets and contests, and co-op teams and groups. (App. 241-43)

21.     The State of Oklahoma has delegated athletic eligibility for transfer students to the OSSAA.  70 Okla. Stat. §8-103.2 (Pl. Ex. 4, App. 53-54, 247)

22.     The State of Oklahoma has provided the OSSAA with an exemption from a statute prohibiting discrimination among amateur sports organizations. 3A Okla. Stat. §301 (Pl. Ex. 5, App. 248-49)

23.     The State of Oklahoma has delegated to the OSSAA the determination of a "sanctioned athletic event" under 70 Okla. Stat. 24-131.1 and provides a specific exemption to a penal statute to the competitors, coachs, or officials of an OSSAA sanctioned event under 70 Okla. Stat. §24-131.2. (Pl. Ex. 6, 7, App. 250-51)

24.     OSSAA is an educational support agency and its employees are entitled to participate in the Oklahoma State Teacher's Retirement System and OSSAA pays the employer contribution required by law. (App. 158-60)

OSSAA MEMBERSHIP AND THE APPLICATION PROCESS FOR MEMBERSHIP:

25.    OSSAA members are primarily secondary schools, but if a high school is a member, its junior high is automatically a member, so for all effective purposes, the OSSAA rules apply to grade seven through twelve. (App. 27, 212)  The reports for admission required by the Constitution are basically informational. (App. 36-7, 76-7)

26.    Once a resolution is procured from a government school and completion of the informational report, admission of the public school, government Indian service school, Oklahoma School for the Deaf, and Oklahoma School for the Blind is virtually unconditional. (App. 38)

27.    There are no other regulations or rules that govern the admission process that have been passed by the Board and the Association follows only the Constitution. (App. 37-38)

28.    There is no rule or regulation either in the Constitution or the rules or the decisions of the Board of Directors that specifies a specific criteria used by a voting member to decide the admission of a private school. (App. 48)

29.    Prospective members write a letter establishing a proposed boundary area for athletic eligibility, explaining the school, and listing the schools that have endorsed a vote on the prospective member. (App. 46-8)

30.    Once selected a member, there are no rules for expulsion of a member and the severest penalty that can be imposed is a suspension from competition with other members of the Association. (App. 49-50)

ATHLETICS, ELIGIBLE SCHOOL DISTRICTS, CLASSIFICATIONS, AND HARDSHIPS:

31.    There is no specific admission requirement that a school seeking admission must declare a "district" (App. 41), but student athlete eligibility for public schools are determined by the existing school district boundaries. ("Rule 8," App. 227-29)  The district can be established by the State Department of Education, school consolidation or otherwise. (App. 39)   Nonpublic schools that seek membership submit with their resolution a specification of a "district" for athletic eligibility.[5] (App. 43-44, 82-84)

32.    Sequoyah and Riverside, nonpublic government operated Indian schools, were admitted without any specification of a district boundary and so every student seeking to

---

[5]   Membership applications must be accompanied by the petition of at least 20 OSSAA members as would be consistent with a motion for a rule change of the Association. (OSSAA Constitution, Art. VII, Sec. 2, App. 218; Pl. Ex. 10, App. 255, 257)

Although there is nothing in the membership process which appears to require a nomination petition procedure for nonpublic schools, the Association apparently treats a private membership addition as a rule change under Article VII, Section 2 and this requires a petition signed by 20 of the present OSSAA members. (App. 218, 82-3)

play athletics is subject to hardship waiver for athletic competition and none are eligible by rule. (App. 39-41)

33.    The other nongovernmental schools have specified districts as follows which are incorporated in Rule 8(1)(a) (App. 42-7, 227, 246):

| | |
|---|---|
| Bishop Kelly High School | Tulsa Independent School District |
| Cascia Hall High School | Tulsa Independent School District |
| Metro Christian Academy | Tulsa Independent School District |
| Bishop McGuiness High School | Oklahoma City Independent School District |
| Mt. St. Mary High School | Oklahoma City Independent School District |
| Heritage Hall High School | Oklahoma City Independent School District |
| Oklahoma Bible Academy | Major County or Garfield County |
| Oklahoma Christian School | Oklahoma City Independent School District or Edmond School District |
| Victory Christian School | Tulsa Public School District or Jenks Public School District |
| Corn Bible Academy | Custer or Washita Counties |
| Government Indian Service School | If no established eligibility by having participated in another school |

34.    Schools are grouped, or classified for competition purposes, by the Average Daily Membership (ADM) of each school as shown on the Annual Statistical Report completed by the Examiner's Division of the State Department of Education. (App. 72-74)  The OSSAA maintains records regarding ADM which vary from year to year. (Pl. Ex. 9, App. 253-54, 802-03, 804-05, 806)

35.    There are 471 members of the OSSAA. (App. 72; Pl.Ex.9, App. 253-54)  To Rennels knowledge, other than charter schools, there are no public secondary schools that are not members of the OSSAA. (App. 110-11)

36.    There are 12 nonpublic school (Counting the Indian service schools and not counting the Schools for the Deaf and Blind). (App. 43, 301-302, 806)  Two of the Indian schools have government affiliation leaving nine with religious affiliation. (Pl.Ex.26, App. 302)  That affiliation, classification, and ADM in 1998 was as follows:

| School | Affiliation | Class | ADM |
|---|---|---|---|
| Bishop McGuiness | Catholic/Parochial | 4A | 694 |
| Bishop Kelley | Catholic/Parochial | 5A | 878 |
| Cascia Hall | Catholic/Parochial | 3A | 350 |
| Corn Bible | Interdenom/ACSI | B[6] | 85 |

---

[6]    Although this information is taken from Pl. Ex. 3 (App. 246), it is possible that Corn's classification should have been "C" in 1998.  (See App. 806 for 1998 figures for football for Corn Bible Academy and cross-reference to the ADM exhibit for 1998-99 (App. 802-03))

| Heritage Hall | College Prep/ISAS | 2A | 243 |
|---|---|---|---|
| Metro Christian | Interdenom/State Ac | 3A | 315 |
| Mount St. Mary | Catholic/Parochial | 3A | 246 |
| Oklahoma Christian | Interdenom/ACSI | 2A | 186 |
| Oklahoma Bible | Interdenom/ACSI | A | 141 |
| Riverside Indian | Boarding/State | 3A | 241 |
| Sequoyah | Boarding/State | 3A | 277 |
| Victory Christian | Interdenom/ICCA | 3A | 349 |

37.     Generally athletic and non-athletic activities are reclassified in the fall of each year based upon the most current ADM.  Football, dual team wrestling and 5A soccer are reclassified on a two-year cycle.   Generally all sports activity are subject to classification, although not all classes are the same. (Rule 13, App. 232-33, App. 44-5; Pl. Ex. 9, App. 253; App. 70-71, 74)  Swimming and diving has only one class for all schools. The classification system is also based upon the number of schools that participate. (App. 75)  In playoff, no team can play above their classification, although they can schedule higher class teams during the regular season. (App. 76-7)

38.     Participants in the Football Championship are classified by ADM as follows:

   a.  Class 6A shall include the 32 largest schools in size playing 11-man football.
   b.  Class 5A shall include the next 32 largest schools in size playing 11-man football.
   c.  Class 4A shall include the next 32 largest schools in size playing 11-man football.
   d.  Class 3A shall include the next 32 schools in size playing 11-man football.
   e.  Class 2A shall include the next 64 schools in size playing 11-man football.
   f.  Class A shall include all remaining schools playing 11-man football.
   g.  Classes B and C shall include the 72 Class A football playing schools with the smallest ADM that petition to play 8-man football.

   For classification purposes in all sports, the ADM for any non-coed school shall be doubled. Classifications 2A and above are not eligible for assignment to participate in the eight-man football championship program.

   (Rule 14, Football Championship, App. 234-35)

39.     Schools are classified into districts of which the number of districts for each classification is determined by the Board of Directors (Rule 14, App. 235)

40.     The OSSAA does not schedule games for individual schools, but does appoint a district chairman who shall call a meeting of the school representatives in each district to complete district schedules.  Every school that participates in football is classified in a district.  Each team is to play all other teams of the district.  The entire district schedule must be completed before contracts for games with schools outside the district become binding.  The first, second, third, and fourth place finishers in all classes from each district shall be eligible to participate in elimination games. Because 10 games is

the limit in football, generally no team can schedule more than 3 nondistrict games. (Rule 14, Sec. 4; App. 68-71, 235)

41.    With exceptions noted in the Residence Rule (Rule 8) and other Rules, including the Participation Rule (Rule 7), generally students who attempt to establish eligibility in a district other than where his or her parents live must attend the school two full semesters or one full year to regain eligibility. (Rule 8(1)(b), App. 226-27)

42.    The State Department of Education identifies and categorizes many of the non-public schools and they are identified as "Other Schools, Entities, and Agencies." (App. 807-14) A review of the list self-identifies most of these schools as religiously themed. Rennels would assume that from their names that most non-public schools in Oklahoma are religious. (App.112)

## CHA'S MEMBERSHIP APPLICATION AND CONCERNS ABOUT NON-PUBLIC SCHOOL ADMISSIONS:

43.    CHA is located at 4400 S.E. 27th Street, Del City, Oklahoma.  CHA was founded in 1972.   Ralph Bullard is the Headmaster.   CHA was established as an outgrowth of Sunnylane Baptist Church. CHA is independent of any church, has grades K through 12, and is a private religious Christian School. (App. 565-66, 634-35)

44.    CHA sought membership in the OSSAA by first submitting a letter of request along with letters of recommendation from OSSAA member schools. CHA selected Mid-Del and Midwest City as its declared district because more than half its families lived in these two districts. (App.78-80; Pl.Ex.10, App. 79, 255-77)  CHA had made prior contact with the OSSAA about membership. (Pl.Ex. 11, App. 280)

45.    The Application was presented at the March 25, 1998 meeting of the Directors and a vote was made to submit the application to the membership. (Pl. Ex. 12, App. 282) The minutes reflect that at the same meeting a discussion was held about concerns with public schools regarding OSSAA non-public schools.

46.    CHA's application would not have been submitted to membership vote if CHA was not otherwise qualified (App. 82-3, 207)

47.    CHA's Application was submitted to all members. The legislative ballot was accompanied by Bullard's letter and a list of recommending schools.  (App. 84-5)

48.    The results of the March 26, 1998 CHA vote were tallied with a final vote of 153 for, and 184 against. (Pl. Ex. 13, App. 284; App. 84)

49.    Controversy arose as a part of CHA's pending application.  A letter from Perry Adams, Superintendent of Inola, was sent to various members of the OSSAA detailing concerns about the growing number of non-public schools seeking membership. Included with the letter was a petition to be signed and returned to Adams for submission to the OSSAA. (Pl. Ex. 14, App. 285-86; App. 85-6)

50.     Adams presented the signed petitions that he received to Bill Self, then Executive Director.  He detailed a claimed "absence (sic) equity in classification and participation in regards to non-public schools."   He identified these concerns as "perceived" suggesting that if the perception were correct, perhaps changes might be made and if they were inaccurate, information concerning these issues should be disseminated.   He acknowledged the excellent reputation of the OSSAA for doing what is best for all students of Oklahoma Schools. (Pl. Ex. 16, App. 289)

51.     In response to Adams letter and other concerns, a constitutional revision committee recommended that the directors appoint a Pro-Active Non-Public and Public School Committee which they did.   Dallas Caldwell, Superintendent of Schools at Oklahoma Bible Academy, was appointed chair and the Committee included Perry Adams. (Pl. Ex. 17, 18, 19, 20, 21; App. 122-24, 126-29, 290, 291, 292-3, 294, 295)

52.     The Pro-Active Committee met and considered various concerns about non-public schools.  Information was gathered and reports were submitted to the Board of Directors. Members of the Committee attended OSSAA area meetings to listen to concerns and clarify existing rules. (Pl. Ex. 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 38-39, 44; App. 298-99, 300, 301-02, 303, 304, 305-08, 309-10, 311-15, 316, 317-27, 358-60, 371-72)

53.     A report from the Committee was sent to all members. (Pl. Exs. 25, 26 (App. 301, 301-02), Rennels (App. 134-35)

54.     The reports indicated perceived inequities although it found no empirical evidence of inherent advantages for non-public schools.  This suggested that there was no reason why any school who would submit to OSSAA rules and regulations would be denied membership.  It appeared that a large faction of the membership did not believe that non-public schools should participate in the Association under current rules.  The report of the Committee suggested some minor changes in eligibility and the school membership application process. (Pl. Ex. 30, App. 309-10)

55.     After the first CHA ballot, Bullard met with Self and Rennels about the defeated Application.  Rennels discussed the district boundary issue and suggested that the request for Mid-Del and Moore (actually Midwest City) could have been some of the problem. (App. 149-150, 159-611, 186-87; Pl. Ex. 10)

56.     CHA reapplied for admission.  The OSSAA Board of Directors approved a new legislative referendum ballot dated August 19, 1999. (Pl. Ex. 37, 38, 39, App. 330-33, 358, 359-60).  The application consisted of a new letter from Bullard and the required petition letters. (App. 332-33, 331, 334-357)  This time the application limited the district boundary to Mid-Del Public School District. (App. 150-51, Pl. Ex. 37)

57.     An application for admission from Harvest Christian School was also submitted and approved for submission to the OSSAA membership for vote at the same time as CHA. (Pl. Ex. 35, 36, 39, App. 328, 329, 359-60)

58.     The results of the CHA vote were tallied on September 9, 1999 with a final vote of 113 for and 188 against.  The Harvest Christian School results were 116 for and 236 against. (Pl. Ex. 40, 41, 42, 43b, App. 361, 362, 363-64, 365-70)

59.     Bullard subsequently met with the OSSAA Board of Directors to discuss the circumstances of CHA's inability to obtain membership. (App. 161-63; Pl. Ex. 46, 47; App. 373, 374-75)  The Board was not interested in changing the procedures in the way a school could be selected. (App. 166-68)  The referendum election procedure had been effect since at least 1991. (App. 164-65)

## THE ARBITRARINESS, CAPRICIOUSNESS, AND NONRATIONALITY ABOUT CONCERNS INVOLVING NON-PUBLIC NONGOVERNMENTAL (PRIVATE) SCHOOLS:

60.     The ballot votes for CHA were either "yes" or "no."  Rennels testified there is no way to figure out any reason why CHA was rejected just from viewing the ballot results because no reasons are given. (App. 154)

61.     The special report prepared by the Public/Non-public Committee summarizes the problems relating to the perception of non-public schools by public schools. (Pl. Ex. 26, App. 301)

62.     Rennels thinks that communications seems to be the real problem at hand and ". . .was probably as large an issue as we've dealt with as anything in that there was and has been perhaps some miscommunication as to how it applies to eligibility of students, whether the non-publics fall under the same rule as public, et cetera.  I thought that Dallas summed it up very well in that paragraph, the third one down on the right-hand column" of the report. "I thought his summation there was good." (App. 135-36; Pl. Ex. 26, App. 301)

63.     The paragraph apparently referenced by Rennels in Pl. Ex. 26 is this:

It is also imperative that effective education of our communities and schools leadership becomes a priority.  The fact that the OSSAA Handbook of Rules and Regulations applies to all schools, public and nonpublic, doesn't seem to be fully grasped.  There is some public perception that private schools are not subject to these policies; that they are free to compete outside any regulating boundaries.

## ISSUES ABOUT RECRUITING AND FINANCIAL INCENTIVES:

64.     Adams' Petition detailed concerns that nonpublic schools would offer financial aid, scholarships, work study, and work assistance programs to attract students. However, Rennels stated that Rule 8, which forbids recruiting by offering financial inducements, applies to both public and non-public schools. (App. 87-88, 102-04)

65.    Rennels also testified that OSSAA schools must ensure that the nonmembers they play will also follow OSSAA rules, but he does not know how compliance is monitored. (App. 104-05)

66.    The Public/Non-Public School Committee acknowledged that recruiting is in the forefront of most concerns and the perception is that private schools obtain athletes by recruiting.  However, recruiting is against OSSAA regulations and non-public schools are not allowed any special privileges or latitude to recruit. (Pl. Ex. 26, App. 301; Pl. Ex. 31, App. 313)  The Committee identified this concern in attendance at area meetings and concluded the problem was a shortage of facts and inadequate knowledge of the *OSSAA Administrator's Handbook*. (Pl. Ex. 31, App. 311)

67.    A Committee report "Point/Counterpoint" comments that "All public school students are on 'full rides.' " (Pl. Ex. 31, App. 315)  The reality from CHA's point of view is students rarely leave public school to come to a private school where they must pay tuition and CHA has lost students to play athletics in the public school because they were not in the OSSAA and there may have also been students who did not even consider CHA because it was not in the OSSAA.  In fact, membership in the OSSAA would be detrimental in part to CHA because of the transfer rule that requires students to sit out, a condition that does not occur now. (Merrill, App. 52-4)

68.    Perry Adams contended in his petition that non-public schools can offer financial aid and that recruiting is a concern. (Pl. Ex. 14, App. 286)  Later Perry acknowledged that "All schools, public and non-public, must comply with OSSAA rules and regulations.  No exceptions.  These rules prohibit recruiting or giving scholarships based on athletic ability.  . . The OSSAA actively pursues alleged violations and has an excellent history of dealing with violations in a fair and consistent manner. . . Until you have all the facts there is no way to determine if a violation actually exists." (Pl. Ex. 26, App. 302)

DISTRICT BOUNDARIES:

69.    There are concerns about district boundaries.  Rural schools feel there is an inequity about facing a private school from an urban area.  However, the Committee indicated that non-public schools contend there are only a limited number of students who can pay, submit to the school philosophy, or fit the whole program.  A recent change in the transfer eligibility rule requires a student to sit out 365 days to discourage high school transfers for athletic purposes. (Pl. Ex. 26, App. 301)

70.    Rennels believes that the boundary rules are used to establish eligibility and are unrelated to recruiting.  Students have to be from somewhere and the home district is selected where their parents are bonafide residents.  If the student wants to move for some reason other than athletics, they still have to meet the standards established by the Rule.  This could include reasons that have nothing to do with sports.  There are specific rules which prohibit recruiting and all OSSAA members are bound by those rules. (App. 100-103)

71.    Perry acknowledged that the perception of district boundaries is just that, a perception. While ". . . private schools can draw from a wide range of students . . the OSSAA Handbook clearly defines district boundaries for all private school. Those not living in the district must apply for a transfer. . . . School choice is not really nothing new. Most public schools have open transfer policies. Parents who choose to send their children to a private school . . . could just as easily choose a public school. Therefore, the problem of illegal recruiting is not an inherent problem with the private schools. . . . The reality is that if a student moves into the private school district, or transfers to a private school, he or she is under the same eligibility requirements as a public school would enforce."[7] (Pl. Ex. 26, App. 302)

72.    The Committee determined that practical considerations govern enrollment at private schools because of the tuition requirement versus a free public education in the public schools. "It is . . . a stretch to assume that students who attend non-public schools are going to be inherently better athletes. . . if higher standards for admissions correlate with strong athletic programs, we should expect Harvard, Yale, MIT, and Rice to win national champions on a regular basis." (Pl. Ex. 31, App. 313)

A HIGHER PERCENTAGE OF STUDENT PARTICIPATION FROM NON-PUBLIC SCHOOLS COMPARED TO PUBLIC SCHOOLS:

73.    Adams identified in his Petition a concern about the "percentage of students who participate in OSSAA activities in public schools as related to percentage of students participating in non-public school." (Pl. Ex. 14, App. 286)  The Committee found this was the purpose of good athletic and activities programs.  "The whole reason of competition is to set standards of excellence and challenge participants to excel. Every school, whether public or non-public should strive to establish programs that maximize not only student participation, but parent and community participation too.  We can demand that excellent programs become more mediocre so that we can compete with them, or we can get better." (Pl. Ex. 31, App. 313)

74.    Rennels does not think that it makes any difference to the OSSAA if a school has a higher percentage of non-public students who participate in activities as compared to public schools.  This is a non-issue to him. (App. 108)

MONITORING OF ADM DATA BY NON-PUBLIC SCHOOLS:

75.    Perry's petition raised concerns about the accuracy of ADM numbers by non-public schools. (Pl. Ex. 14, App. 286)  Rennels testified that the OSSAA has rules for verification of ADM numbers by non-public schools as well as for districts with multiple high schools which do not furnish individual ADM to the State Education Department.

---

[7]    Adams original Petition indicated that CHA would seek a district that would include the Moore Public Schools and Midwest City/Del City Public Schools. (App. 286)  In actuality, the first application was for Mid-Del and Midwest City as its declared district. (App. 78-80; Pl. Ex. 10, App. 79, 255-77)

Rennels does not believe that those numbers are fudged by either the multiple school districts or the non-public schools. The OSSAA is provided with computer printouts from all of those. There are rules for counting ADM's that are uniformly applied between public and non-public schools. (App. 105-07)

OTHER RESPONSES TO ADAMS' PETITION:

76.    Adams' letter along with the executed petitions were sent to the OSSAA. (Pl. Ex. 16, App. 289)

77.    Rennels identified that the claims referenced in Adams' letter are nonissues to him. (App. 100-09) Rennels does not agree with its statement that there is an absence of equity in classification and participation in regards to non-public schools. (App. 117-18)

78.    Dennis Demuth, superintendent at Victory Christian, an OSSAA member wrote a response to Adams' letter and Petition. (Pl. Ex. 15) He said that Victory Christian now is bound by the rules of the OSSAA whereas prior it was free to set its own eligibility and transfer policies. Verification of ADM can occur for state accredited schools because enrollment numbers become public knowledge verified by the State accreditation officer during an annual visit. Demuth identified that as to the percentage of students who participate, it is the goal of every school to strive for the maximum participation of students in as many activities as possible. "The National Report of Research About R[T]eaching and Learning concluded, 'Student involvement sustained over time in one or two extracurricular activities contributes to overall achievement in college.' " Students attending public schools receive financial aid to go to school that no private school could match. The decision to send a child to a private school and still pay taxes to support the public school is a decision of the parent to place their child in an educational environment that is more compatible with their philosophy and needs of their children. (Pl. Ex. 15, App. 287-88)

79.    Rennels agrees with Demuth's statements about audits for verification of ADM, percentage of student participation, financial aid to students (except financial aid given to an athlete because he or she is an athlete). The only application of the residence requirement is to athletics. (App. 109, 112-5)

80.    The primary concern that is expressed to Rennels is the size of the districts of the non-public schools because of the potential drawing area. (App. 118-20) He recognizes this concern from those who don't understand the makeup of the non-public school and the issues of tuition and what has to be paid. (App. 120-21)

81.    If the district size is not properly monitored by the OSSAA as well as the private or non-public schools, it could be a problem, but from the perspective of the OSSAA, Rennels testified there have not been problems in monitoring those issues. (App. 121-22)

82.    To Rennels, the district size of non-public schools is a perceived problem by the public schools. A perception might arise that schools with larger size district might have

a better performance on the field. Although Rennels thinks this could be perceived, he is not sure in actuality whether that would occur. (App. 186-87)

83.    There have been public schools that have dominated championships for years. For example, in football Class 6A, Jenks won six consecutive state championships from 1996 to 2001. Jenks was beaten in 2002 by rival Tulsa Union. (App. 182-83, Pl. 56, App. 392-93)  After realignment of the football classification (App. 409, 818) Jenks recently defeated Tulsa Union in a semifinal game. (App. 817)  Yet, despite its success, the 2003-04 ADM of Jenks is approximately 2743 while Union's is 3744 and Broken Arrow's is 4275.  Even though there is a disparity of 1,000 less students than Union, Jenks has consistently either beaten or finished higher than either Union or Broken Arrow 7 out of the last 8 years. (Pl. Ex. 9, App. 253; Pl. Ex. 56, App. 392-93)

84.    In its class, Morrison won 9 out of 11 state football championships from 1984 to 1994 of which 7 were consecutive. (Pl. Ex. 56, App. 392-93; App. 190-92)  Morrison once possessed a 90 game winning streak before losing to Snyder in 1995, the eventual state champion. (App. 815)  Pioneer-Pleasant Vale won 5 out of 6 championships between 1996 and 2001.  Carl Albert won 5 consecutive titles between 1997 and 2001. (Pl. Ex. 56, App. 392-93)

85.    Rennels has had concern expressed to him about successful teams like Jenks, Broken Arrow, and Union by other members in their class who feel like they are shut out. (App. 188-89)  However, Rennels thinks these win streaks are cyclical, it goes and comes whether it's public or non-public. "  . . . it could be coaching, it can be any number of things that develops these winning streaks." (App. 187-88)  The cycle that Rennels is talking about is illustrated by Morrison's consecutive championships interrupted by Welch in 1987 and Pond Creek in 1985. Rennels does not view these as unusual. (App. 190-92)  "It just happens. Obviously unless there are outside things that take place.  But in the years I have been in the business it's about, which is 30, it just goes in cycles.  The ebb and flow of athletics is that way. . . (Q. Like you said, a hot coach?) . . .Yes. An administrator that really is interested or any number of other things that help." (App. 196-97)

86.    Rennels thinks that when a team like Jenks wins six in a row, some other teams take it as a challenge and try to get better.  Some of them probably say that they are too dominant and we can't get better.  So it depends again upon some philosophy.  Rennels thinks that Tulsa Union has taken it as a challenge to try to get better and see if they can't beat Jenks.  For a number of years Tulsa Union was the one being beaten in the finals by Jenks. (App. 198, 200; Pl. Ex. 65, App. 408)

87.    There are numerous other examples of such streaks in state sports championships. (Pl. Ex. 57, 58, 59, 60, 61, 62, 63, App. 392-406, 786-801)

NON-PUBLIC SCHOOLS COMPARABLY SITUATED TO CHA WHICH ARE ALREADY MEMBERS OF THE OSSAA:

88.    Rennels identified that a comparable school to CHA is Heritage Hall, a 2A private school located in a metropolitan area, Oklahoma City (eight high schools). (App. 89-93) Oklahoma Christian School was a 2A school with a district of Oklahoma City and Edmond. (App. 92, 806)

89.    Rennels testified that in March of 1998, there were comparably sized nonpublic schools to CHA that have a district boundary in a metropolitan area who were admitted and practicing membership in the OSSAA. (App. 95)

90.    There were also several 3A schools in the same period of time that were slightly larger than CHA that had a district defined in a major metropolitan area.  This included Victory Christian in the Tulsa/Jenks school district, Mount St. Mary in the Oklahoma City school district, Metro Christian in the Tulsa school district, and Cascia Hall in the Tulsa school district.  There are public schools like Millwood located in metropolitan areas and not part of the Oklahoma City Public Schools. (App. 95-97)

91.    In looking at Mr. Perry's letter and the list of nonpublic schools, Rennels cannot identify any discernible difference between the application of Christian Heritage Academy and, for example, Oklahoma Christian. (App. 98)

## D.  THE TEST FOR SUMMARY JUDGMENT

Summary judgment is decided under **Fed R.Civ.P. 56(c)**; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986).  If no material fact is genuinely in dispute,[8] the court must decide if the movant is entitled to judgment as a matter of law.  A court should grant summary judgment ". . .if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See *Anderson*, 477 U.S. at 247-8.

## E.  ARGUMENT AND LEGAL AUTHORITY

## PROPOSITION I

---

[8]   "The [s]ubstantive law will identify which facts are material," *Anderson, id*.   "[A] dispute about a material fact is genuine . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson*, 477 U.S. at 248.  The record is examined in the light most favorable to the nonmoving party. *Osgood v. State Farm Mutual Auto Insurance*, 848 F.2d 141, 143 (10th Cir., 1988); *Anderson*, 477 U.S. at 255.

## OSSAA IS A STATE ACTOR BOUND BY DUE PROCESS AND EQUAL PROTECTION.

The Due Process Clause and Equal Protection clauses of the Fourteenth Amendment stand guard against unfair and unequal treatment by the government. A threshold question in any 42 U.S.C. §1983 action is whether the actor acts on the behalf of the State.[9]

There need be little doubt that the OSSAA is a state actor exercising the power of its numerous governmental entity members in a manner which confers benefits or imposes penalties against its own members. The OSSAA even asserts control over the actions of nonmembers because it compels members to require those with whom it engages in competition to adhere to the rules of the OSSAA. See Statement of Fact Paragraph 65 (Hereafter Para. (number))

---

[9]   While the OSSAA indicated at the Status Conference that it would not contest the issue of its status as a "state actor" only for purposes of this action, as a jurisdictional requirement this Court must determine some level of state action in this matter because:

> A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking. *Bradbury v. Dennis*, 310 F.2d 73 (10th Cir., 1962), *cert. den.*, 372 U.S. 928, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963). The party invoking the jurisdiction of the court has the duty to establish that federal jurisdiction does exist, *Wilshire Oil Co. of Texas v. Riffe*, 409 F.2d 1277 (10th Cir., 1969), but, since the courts of the United States are courts of limited jurisdiction, there is a presumption against its existence. *City of Lawton, Okla. v. Chapman*, 257 F.2d 601 (10th Cir., 1958). . . .
>
> . . . Therefore, lack of jurisdiction cannot be waived and jurisdiction cannot be conferred upon a federal court by **consent, inaction or stipulation**. *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); *Natta v. Hogan*, 392 F.2d 686 (10th Cir., 1968); *Reconstruction Finance Corp. v. Riverview State Bank*, 217 F.2d 455 (10th Cir., 1955).
>
> *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir., 1974)

There are numerous cases in which organizations in other states comparable in form or structure to OSSAA have been held to involve "state action."[10]

The OSSAA in a precursor form has been determined to be a state actor by the Tenth Circuit.  In *Oklahoma High School Athletic Assn.v. Bray*, 321 F.2d 269, 272-273 (10th Cir., 1963), the Circuit held that the actions and rules of the Oklahoma High School Athletic Association were made "under color of the laws of the State of Oklahoma, and consequently well within the compulsion of 42 U.S.C. §1983."  The OSSAA history and the testimony of Rennels shows that the OSSAA changed its name from the Oklahoma High School Athletic Association in the 1960's broadening from athletics to an activities association. See Para 11.

The Supreme Court has held that a similar activities association in Tennessee exercises state action.  See *Brentwood Academy v. Tennessee Secondary School Activities Association*, 531 U.S. 288, 121. S.Ct. 924 (2001).  The Tennessee Secondary School Activities Association (TSSAA) regulated interscholastic athletics among Tennessee public and private schools (who were members of TSSAA), in much the same manner as OSSAA does in Oklahoma.

TSSAA penalized Brentwood Academy, a private school member, for allegedly violating a recruiting rule and imposed certain sanctions against Brentwood including probation, team ineligibility, and a fine. *Brentwood*, at S.Ct. 293.

---

[10] *Griffin High School v. Illinois High School Assn.*, 822 F.2d 671, 674 (7th Cir., 1987); *Clark v. Arizona Interscholastic Assn.*, 695 F.2d 1126, 1128 (9th Cir., 1982), *cert. den.*, 464 U.S. 818 (1983); *In re United States ex rel. Missouri State High School Activities Assn.*, 682 F.2d 147, 151 (8th Cir., 1982); *Louisiana High School Athletic Assn. v. St. Augustine High School*, 396 F.2d 224, 227-228 (5th Cir., 1968); *Indiana High School Athletic Assn. v. Carlberg*, 694 N.E.2d 222, 229 (Ind., 1997); *Mississippi High School Activities Assn., v. Coleman*, 631 So.2d 768, 774-775 (Miss., 1994); *Kleczek v. Rhode Island Interscholastic League, Inc.*, 612 A.2d 734, 736 (R.I., 1992); See also *Moreland v. Western Penn. Interscholastic Athletic League*, 572 F.2d 121, 125 (Cal., 1978).

Brentwood sued in federal court under 42 U.S.C. §1983 claiming that enforcement of the recruiting rule was state action and violated the First and Fourteenth Amendments.[11]

The Supreme Court held that the discipline imposed by TSSAA was state action under the Fourteenth Amendment. *Brentwood* at S.Ct. 294.

". . .we say that state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' " *Brentwood* at S.Ct. 295 citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449 (1974)

Because all member schools of the TSSAA were from the same state, Justice Souter distinguished the Court's decision in *National Collegiate Athletic Assn. v. Tarkanian*, 488 U.S. 179, 193, n. 13, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). *Tarkanian* held that it was difficult to treat the NCAA as a surrogate for the state when it consisted of several hundred members from all over the entire United States and made the distinction in dicta (elevated to holding in *Brentwood*) that the decision might be different if all members were from one state (true in both Tennessee and Oklahoma). *Brentwood* at S.Ct. 298.

Any distinctions between *Brentwood* and this case mitigate in favor of a finding of state action. Justice Souter noted that TSSAA was incorporated (*Brentwood*, at S.Ct. 292) while OSSAA is an association. Fed.Rul.Civ.Pro. 17(b) give an unincorporated association the capacity to sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States. The membership of the association is not transparent to a transaction where the Association has an interest:

> [W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's

---

[11] Although the OSSAA guarantees "due process" in its Constitution, (Art. IV, Sec. 6, App. 216-17), in light of *Brentwood*, Plaintiff contends this is no "gift" from the Association, but a required federal constitutional mandate.

purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

> *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 116 S.Ct. 1529, 1534 (1996)

Here there is no corporate entity to isolate individual members from claims alleging that their actions deprived CHA of constitutionally protected rights.

The Supreme Court further noted that "Only the 16% minority of private school memberships prevents this entwinement of the Association and the public school system from being total and their identities totally indistinguishable." *Brentwood, id.* It would be even more indistinguishable as to OSSAA as there are only 10 nonpublic-nongovernment schools out of 471 members and only one of those is a nonreligious school (Heritage Hall).

## PROPOSITION II

**THE MEMBERSHIP PROCESS OF THE OSSAA VIOLATES DUE PROCESS AND EQUAL PROTECTION AS ARBITRARY AND CAPRICIOUS IN THAT THERE ARE NO APPARENT STANDARDS AND NO REASON TO EXCLUDE CHA WHICH OTHERWISE MET THE QUALIFICATIONS FOR ADMISSION.**

There can be little doubt that OSSAA membership is a useful and valuable status and that exclusion from OSSAA can have detrimental effects on a nonmember. For example, OSSAA members are offered guaranteed schedules in football within their districts while nonmembers can have difficulty in filling their schedule.[12]

---

[12] Although these schedules are not made by the OSSAA, its rules require that all members in a district play each other. No nondistrict game contracts are binding until all district game schedules are completed. (Rule 14, Sec. 4; App. 68-71, 235) In contrast, CHA identified serious difficulty in scheduling games because the district schedules of comparable teams prevented adding CHA to their schedules. (Bullard Aff., App. 568)

Still, CHA has twice been denied membership.  The evidence of continuing hostility to nonpublic schools is still apparent and clearly evident.

Achieving membership by a public school in the OSSAA is a seemingly benign process. It requires only a resolution seeking admission and a direction to the school administration to abide by OSSAA rules. (Art. III, Sec. 1, App. 212)

However, nongovernmental schools are subject to a standardless vote of the membership.[13]  One element of that vote is that nongovernmental schools declare a "district" although there is no such requirement specified in the membership article of the Constitution.

In engaging an analysis of CHA's status from the outside of the OSSAA, we look at related theories of due process and equal protection because they are intertwined in the treatment toward CHA.[14]

---

[13]   In another, yet similar context, the Supreme Court has concluded that uniform standards in vote counting are an absolutely necessary exercise of due process. See *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 530 (2000)("The problem inheres in the absence of specific standards to ensure its equal application.  The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.")

[14] In the context of the Fifth Amendment, which has no equal protection clause, the Supreme Court assumes, for example, that equal protection is a component of due process:

> Although "the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.' " *Schneider v. Rusk*, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964).  Thus, if a federal statute is valid under the equal protection component of the Fifth Amendment, it is perforce valid under the Due Process Clause of that Amendment. *Richardson v. Belcher*, 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971).
>
> *U.S. R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 101 S.Ct. 453, 471, Ftnte 8 (1980)

As previously noted in Plaintiff's Motion to Dismiss,[15] there is applicable case law in the exact and general area that parallels CHA's claims. *Louisiana High School Athletic Association v. St. Augustine High School*, 396 F.2d 224 (5th Cir., 1968), is a case cited approvingly by the U.S. Supreme Court in *Brentwood Academy*, at S.Ct. 931.

LHSAA, similar to OSSAA, was made up of 400 schools, 85% of which were public schools and the remainder private schools. *Id.* at 226. To obtain membership in LHSAA, St. Augustine, made up solely of black students, was required to obtain a two-thirds vote of approval from the member schools of LHSAA. Not surprisingly St. Augustine was unable to obtain a favorable vote for admission and filed a class action in the federal district court seeking to enjoin LHSAA from operating a segregated system of interscholastic high school athletics. *Id.* at 225. The district court held that LHSAA, like OSSAA here, was a state actor. See *St. Augustine High School v. Louisiana High School Athletic Ass'n*, 270 F. Supp. 767 (1967).

The district court held St. Augustine had clearly been deprived of membership based upon race, but also further stated, *Ibid.* at 776:

> But even had the plaintiffs failed to prove that the denial of St. Augustine's application was the result of actual discrimination, the deprivation of basic rights of due process has been established here with the force of irrebuttable presumption. The very fact of the denial of St. Augustine's application by the arbitrary and capricious vote of the LHSAA membership constituted a deprivation of plaintiff's constitutional rights.

The district court asked in regard to the member school voting requirement, "What is the purpose of the. . . requirement?" The court then went on to state the " . . most realistic answer . . . is that the voting requirement provides LHSAA with a painless and efficient method of denying membership to any high school it wishes without the necessity of assigning a reason for

---

[15] The legal argument and citations of Plaintiff's Response to the Motion to Dismiss and the Sur-Reply are incorporated herein by reference.

the denial." *Ibid*.  Such a policy of hiding the reason for denial adversely affects not only black

schools, but white schools as well, the Court said. *Id* at 776.[16]   Thus, the district court said

that LHSAA's actions in denying St. Augustine membership were "conducive to wholesale

discrimination and arbitrary and capricious treatment of any and all candidates for membership

in LHSAA and therefore violative of the Fourteenth Amendment." *Ibid*.

The 5th Circuit Court of Appeals agreed with the District Court that LHSAA may

establish reasonable and definite standards for membership, but nevertheless held that LHSAA

had denied St. Augustine membership on racial grounds.  In so doing, the Court held that

membership "could not be denied to applicants meeting those standards on the basis of adverse

vote by those already fortunate enough to be participants." *Id*. at 228.  An "arbitrary vote"

meant, the Court said, "a vote to deny membership to an applicant which has met proper and

reasonable membership requirements and standards as defined by the Association." *Ibid* 228.

CHA was denied OSSAA membership in OSSAA by just such an "arbitrary" vote.

"The result is not changed," the 5th Circuit declared "either by St. Augustine's being

a private school seeking admission to an association composed predominately of public schools

or by existence of private schools as members of the Association." *Ibid*. 228.  Thus, since

---

[16]    The *St. Augustine* trial court also said the effect of the policy was to hide the reason for
denial, *Id*. at 776: "Regardless of whatever other worth the voting provision may have, that is
certainly one of its effects. That effect, the enhancement of the arbitrary power of the state in
these matters, affects not only so-called "Negro schools," but each and every high school of the
State of Louisiana, including so-called "white schools" as well.   Every school seeking
membership must be faced with the prospect of securing the favorable vote of two-thirds of the
members of the Association.  What other state agency or association places such a burden on
the citizens seeking its aid?  Certainly the very thought of such an arbitrary vote by state officers
or agents is abhorrent to the principles of the Fourteenth Amendment and every civil right of
all the citizens of this country, Negro or white."
    While the LHSAA required a vote of all new members, OSSAA's restriction is even
more onerous because it only burdens nongovernmental schools while granting free access to
governmental schools.

24

LHSAA had already admitted private schools to membership, it had to extend the opportunity for membership to other private schools, whether based on race or not, consistent with due process and equal protection standards.

"Having elected," the Court said, *Ibid*. "to allow private schools to participate in this state activity Louisiana must extend the benefit consistent with constitutional standards. And those private schools which choose to participate in this state program, to the extent of their role as members and participants, become amenable to *Fourteenth* Amendment requirements."[17]

It is reasonable to require that governmental decisionmaking be based upon objective and knowable decisions. A federal District Court utilized the *St. Augustine* logic (although decided before that case) in *Wittkamper v. Harvey*, 188 F.Supp. 715 (DC Ga., 1960). There, the city school board of Americus, Georgia refused enrollment of students who lived outside the district, but subsequently granted applications of 24 such students while at the same time denying the three petitioners' applications who also lived outside the district. The applications "were rejected without any reason being given by the City Board." *Ibid*. at 718. Later, one of the student's parent was notified by the Board that the students had been rejected for the best interest of all concerned. Ibid.[18]  The three students then sought to enjoin the school board from refusing to admit them.

---

[17] While some courts have argued the decision in *St. Augustine* was decided on racial grounds, a careful review of the decisions of the district court and the Fifth Circuit shows this not to be true. See *Archbishop Walsh High School v. Section VI*, 666 N.E.2d 521, 524 (N.Y., 1996)

[18] Apparently the Board in *Wittkamper* allegedly thought trouble and disorder might occur if the students were admitted, not because of misconduct by the three students, but as result of possible mistreatment of them by other students. *Id*. at 718.  The court found that there was resentment because of the beliefs and practices of one of the student's parent. *Id*. 720.

In granting the injunction, the District Court held, "Undoubtedly, the City Board could lawfully refuse to accept any students living in Sumter County outside the City of Americus into the school system." *Ibid.* at 720. However, the Court added, once the School Board decides to accept and does accept students living outside of the City of Americus, the Board "is then obligated under the law to afford equal protection to 'all such students desiring to transfer. . . to the City school system." *Ibid.* The court concluded, *Id.* 721: "Since no lawful reason appears for the rejection of the three plaintiffs by the City Board, and since plaintiffs were rejected by the City Board without lawful reason while other County students similarly situated were accepted by the City Board, the Board's action in rejecting plaintiffs denied them equal protection of the laws."

A similar result was reached in *Friends Academy v. Section VIII*, 588 N.Y.S.2d 525 (Sup. 1992) citing *St. Augustine, supra, Id.*, at 531. Friends Academy, a non-public school for boys and girls, sought admission into the New York State Public High School Athletic Association (NYSPHSAA) - the New York counterpart to OSSAA. Friends Academy submitted its application for membership in NYSPHSAA and presented it to the latter's Admission Review Committee which "was very impressed with the overall operation of the school" and which recommended that Friends Academy be admitted. *Ibid.* 527. The application was submitted for a referendum vote by the NYSPHSAA's member schools. However, the vote resulted in a 28-28 tie and Friends Academy was denied membership.

The Court held that the actions of NYSPHSAA "were 'so intertwined with the state' that the actions taken by the association are considered state action." *Id.* at 530. In so holding, the Court observed, *Id.* at 530, 531:

> Even where no fundamental right or suspect classification is involved, citizens are
> entitled to equal protection under the law. . . Non-public school students have the

26

right under the Fourteenth Amendment to be treated in the same manner as public school students with regard to participation in interscholastic athletics, absent some rational basis for treating the two classes of students differently. . . Where there is no fundamental right or suspect classification involved, the test to determine the validity of state action is whether the "unequal treatment" bears some rational relationship to a legitimate state purpose. . . .A classification must be reasonable, and not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object.

The Court held that NYSPHSAA's actions in denying Friends Academy membership was a denial of the equal protection of the laws under Fourteenth Amendment. *Id*. at 533.

In this regard, the Court noted that any public school, which is a member in good standing of the state athletic association, is automatically a member of NYSPHSAA, but observed that non-public schools must meet certain criteria for membership and receive a majority of favorable votes from association members to be admitted. *Id*. at 531.

Friends Academy met all criteria, but was denied membership because of its inability to obtain a majority vote. Since no rational basis was shown for disparity in treatment, it was state action arbitrarily denying Friends Academy membership and thus a denial of equal protection.

In support of its ruling in Friends Academy, the Court cited *St. Augustine, supra, Id*. at 532, 533, where it observed that the *St. Augustine* ruling was based not on just a denial of equal protection because of race, but a disparity of treatment between public and non-public schools without a rational or legitimate basis which affected adversely "Negro schools" and "white schools" alike. "Certainly the very thought," the Court said, "of such an arbitrary vote by state officers or agents is abhorrent to the principles of the Fourteenth Amendment and every civil right of all the citizens of this country, Negro or White." *Id*. at 532.   Thus, the *Friends Academy* Court declared that St. Augustine "is dispositive of the instant action." *Ibid*.[19]

---

[19]  The *Friends Academy* Court said, *Id*. at 532: "The referendum vote requirement set forth in respondent's by-laws, as a prerequisite to membership, permits the respondent to deny a non-
(continued...)

Acknowledging that there is no right to participate in interscholastic athletics, CHA does however assert rights of due process and equal protection.  In this regard, the Court in *Friends Academy, Id.* at 530, cites *Wittkamper, supra.* at 720, and observed that "the petitioner (Friends Academy) does not seek to enforce any 'right' to membership in . . .(NYSPHSAA). .  Rather, it seeks to enforce its right to equal protection under the law, which is a right, in itself, independent of any right to participate in interscholastic athletics. . ."

As noted previously (See Footnote 17) the case of *Archbishop Walsh v. Section VI of the New York State Public High School, Athletic Ass'n, supra.* appears to be inapposite.  While *Archbishop Walsh* did involve the attempt of a private school to be admitted to a state high school athletic association, the Court did hold that the actions of the association in denying membership to the private school because it failed to obtain a majority vote of member schools was "state action." *Ibid* at 522.  Moreover, unlike case at bar, it was also a situation in which no nonpublic school had ever been granted membership in the association. *Ibid.*  The case is a misapplication of the equal protection clause and an erroneous misreading of applicable case law.[20]

---

[19](...continued)
public school, with or without religious affiliation, membership for 'any reason, or for no reason,' upon grounds which are not set forth and are therefore not subject to review."

[20]   As previously noted in Plaintiff's sur-reply to the Motion to Dismiss of the OSSAA, *Archbishop Walsh* did not raise an equal protection argument as among nonpublic schools, nor did it contend that the membership referendum was inherently biased against schools like Walsh:

> Walsh would have the courts apply the higher "strict scrutiny" standard to its claim because, it argues, as a Catholic high school it fits within a suspect classification that qualifies for protection under a heightened standard of judicial review.  **No equal protection deprivation as among nonpublic schools is alleged or involved in this case**.  Walsh's narrowly targeted argument is untenable because the unequal treatment of which it complains is discrimination between public and nonpublic schools, not anything of a religious nature and not
>
> (continued...)

Although post-referendum justification (apparently after the lawsuit was filed in *Archbishop Walsh*) for rejection of the application was given, the referendum involved an arbitrary and capricious process where the applicant private school was given no reason for denial even though its application for membership was accepted under a special category and "met the pertinent special admission procedures." *Id*. at 522. Its application was denied because it failed to receive a majority vote from member schools "for that reason alone." *Ibid*. It is logical to conclude that *Archbishop Walsh* court totally misread *St. Augustine*, *supra*, and *Friends Academy*, *supra*, and unfairly demeaned these precedents as "nisi prius rulings" and "ambiguous," *Id*. at 524.

The court also erroneously said that the 5th Circuit decided *St. Augustine* "unequivocally as preclusion from membership on racial grounds," *Id*. at 524, and had been decided at the "strict scrutiny level," *Id*. at 524, as shown herein *supra* and by Judge Titone's dissent, *Id*. at 525-528.[21]

---

[20](...continued)
even anything within the entire class of nonpublic schools. . .

- - - - -

**Notably, Walsh's due process claim--that the membership referendum is a "secret ballot" that is inherently biased against schools like Walsh--is unpreserved. Thus, the legal implications of any belated due process complaint cannot be considered, nor may we even address the accuracy of the asserted factual underpinnings of the theory.**

> *Archbishop Walsh*, 666 N.E.2d at 523.
> (emphasis added)

CHA has preserved both of these claims in the instant case.

[21] Judge Titone, dissenting, declared that the referendum vote by which Archbishop Walsh High School's application was rejected, "is patently arbitrary and cannot rationally further the proffered legitimate State interest" because it "operates to exclude private schools without reference to any objective or observable criteria." *Id*. at 525. He scoffed at the majority's claim that the association's goals of reducing "competitive imbalances," and of "maintaining
(continued...)

# PROPOSITION III

**THE OSSAA MEMBERSHIP PROCESS VIOLATED CHA'S RIGHTS OF DUE PROCESS AND EQUAL PROTECTION IN THAT THE OSSAA DENIED CHA ADMISSION BUT HAS PREVIOUSLY ADMITTED NONGOVERNMENTAL SCHOOLS SIMILARLY SITUATED TO CHA.**

The essence of due process and equal protection is that similarly situated parties should be treated equally.[22]

While it may be true that the OSSAA could arbitrarily limit its membership to whomever it chooses if it were a private organization,[23] the same should not be true of a governmental entity which professes to represent secondary schools and seeks to control all secondary schools in the state that interact with its members.

---

[21](...continued)
community spirit" "would be jeopardized by unlimited or unqualified membership admittance of private schools that are able to offer financial and other incentives to their students." *Id.* at 525. To this, he observed that, assuming the concerns are true, that the majority had failed to explain "how the referendum vote. . . is a rational means of safeguarding against such feared competitive mismatching or decreased morale in the league." *Ibid.*

Judge Titone also pointed out that the majority had misread the ruling in *St. Augustine, supra,* "as one based on a suspect classification and strict-scrutiny analysis," *Id.* at 526, which it, of course, was not. He emphasized that *St. Augustine* had been decided not on "strict scrutiny analysis, but on the ground that such an arbitrary voting provision was abhorrent to the very principles underlying and protections afforded to every citizen by the Fourteenth Amendment." *Ibid.* He also correctly concluded that *St. Augustine* was decided not just because the referendum vote therein adversely affected "Negro schools," but also because it adversely affected "white schools" as well. *Ibid.* He thus correctly concluded that *St. Augustine* was just as squarely in point as it is in this case.

[22]   There is also no argument that the OSSAA may properly limit the number of its members because no such limits exist or are apparently contemplated. Such an argument would be difficult in an organization already sized at 471 that permits the admission of any public school and with no stated number limits on the number of non-public schools that can be admitted.

[23] As to associational rights controlled by the First Amendment, see *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 115 S.Ct. 2338 (1995)

Preclusion of discrimination by a state actor is founded in notions that government must treat all its citizens fairly and equally. Even if the idea that government actors may exclude nongovernmental schools gains traction because there are boundary differences, this notion shrinks when the state actor favors some nongovernmental schools with membership while other similarly situated nongovernmental schools are excluded without reason.

OSSAA has already accepted nongovernmental members whose profiles and boundaries are virtually indistinguishable from CHA or are, at the least, very similar. Plaintiff identifies these schools on page 15 and their districts on page 8.

For example, Rennels identifies that OSSAA member Heritage Hall was a 2A school with a declared district that encompasses the Oklahoma City Independent School District. (App. 89-93) Oklahoma Christian School was also a 2A school with a district of Oklahoma City and Edmond. (App. 92, 806) Rennels also identifies that there are four 3A private member schools with districts in urban areas which are comparable to CHA, Victory Christian, Mount St. Mary, Metro Christian, and Cascia Hall.[24] See page 17.

Those similarly situated should be treated similarly. See *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 2196 (1999) citing *General Motors Corp. v. Tracy*, 519 U.S. 278, 298, 117 S.Ct. 811 (1997)(noting with respect to interpreting the Commerce Clause, "[c]onceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities"); *Yick Wo v. Hopkins*, 118 U.S. 356, 374, 6 S.Ct. 1064 (1886) (condemning under the Fourteenth Amendment "illegal discriminations between persons in

---

[24] That some of these schools might be 3A instead of sized at 2A is not relevant. Classification by ADM changes frequently and at least once every two years in football. Thus, it is possible that CHA could go up to 3A, or down to A. There are still nongovernmental schools admitted in either class.

similar circumstances");  see also *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 223-224,

115 S.Ct. 2097 (1995)

# PROPOSITION IV

### EXPLANATIONS PROFFERED TO JUSTIFY CHA'S EXCLUSION FROM MEMBERSHIP ARE IRRATIONAL AND DEMONSTRATE AN ANIMUS TO NONGOVERNMENTAL SCHOOLS.

The course of discovery has identified several professed reasons why private schools have

fallen into disfavor when they apply for membership in the OSSAA.   Each reason was

illuminated by the public/non-public school Committee and rejected:

Recruitment and financial incentives (They are prohibited by OSSAA rules. See p. 12)

District boundaries (Uncontrollable as to public schools and controllable by institutional review as to nongovernmental schools. See p. 13)(Rennels testified that district size of non-public schools monitored by OSSAA has not been a problem (App. 118-22))

Higher percentage of student participation in nonpublic schools compared to public schools (Actually desirable so that as many students as possible may participate in beneficial activities.  See p. 14)

Monitoring of ADM Data by nonpublic schools (Can be controlled by institutional controls.  See p. 14)

Rennels testified that any concerns about relative size of boundaries simply is based upon

a lack of understanding of the makeup of the nonpublic schools and the issues of tuition and

what has to be paid. (App. 118-021)  Rennels acknowledged and agreed that the real problem

at hand for the OSSAA identified by the Committee was a lack of communications. (App. 135-

36; Pl. Ex. 26, App. 301, See p. 12)

It should not require much logic to establish that a "lack of understanding" and the

failure to communicate identified by the Committee and concurred in by Rennels (Pl. Ex. 26,

App. 301; App. 135-36 ("I thought his summation there was good.") is a rational basis.

It is also equally clear from the evidence that the refusal of the governmental schools to either admit other nongovernmental schools or to educate themselves about the subject of their admission displays a demonstrated animus toward nongovernmental schools prohibited by due process and equal protection:

> . . . even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained. The search for the link between classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature, which is entitled to know what sorts of laws it can pass; and it marks the limits of our own authority. In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous. See *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (tourism benefits justified classification favoring pushcart vendors of certain longevity); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (assumed health concerns justified law favoring optometrists over opticians); *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949) (potential traffic hazards justified exemption of vehicles advertising the owner's products from general advertising ban); *Kotch v. Board of River Port Pilot Comm'rs for Port of New Orleans*, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947) (licensing scheme that disfavored persons unrelated to current river boat pilots justified by possible efficiency and safety benefits of a closely knit pilotage system). The laws challenged in the cases just cited were narrow enough in scope and grounded in a sufficient factual context for us to ascertain some relation between the classification and the purpose it served. By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law. See *Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 181, 101 S.Ct. 453, 462, 66 L.Ed.2d 368 (1980) (STEVENS, J., concurring) ("If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect").
>
> *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 1627-28 (1996)

In speaking about the Colorado referendum the Supreme Court identified that:

> "Amendment 2 confounds this normal process of judicial review. It is at once too narrow and too broad. It identifies persons by a single trait and then denies them protection across the board. The resulting disqualification of a class of

persons from the right to seek specific protection from the law is unprecedented in our jurisprudence.

It is not within our constitutional tradition to enact laws of this sort. Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance. " 'Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.' "

. . . Respect for this principle explains why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare. A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense. "The guaranty of 'equal protection of the laws [517 U.S. 634] is a pledge of the protection of equal laws.' " *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113 (1942) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886)).

*Romer v. Evans, id.*

Nor should it be within the tradition of an organization which claims to foster fair competition to disadvantage a potential patron simply because that patron competes. If this is true then the purpose of the OSSAA becomes a race toward mediocrity. The disadvantage of nongovernmental schools as CHA is not part of either fair play or equal protection.

## F.  CONCLUSION

Instead of embracing those organizations which meet the parallel responsibility of education, this Association of public schools separates, isolates, and confines them.

With no criteria to inform its choice, the religious school must conquer intuition, innuendo, and invective to become a member. Those who are rejected suffer injury to their Due Process and Equal Protection rights.

Nor does the Association treat all nongovernmental schools alike. Some have been admitted and some have not. Although a state actor obligated to exercise authority fairly and evenly, the OSSAA has chosen to admit and has admitted private school members virtually

34

identical to the excluded CHA.   There is no stated rational wisdom why some have been admitted and others stay out.

This Court should declare the standardless election procedure a violation of due process. It further should declare that OSSAA has violated the equal protection clause of the Fourteenth Amendment by excluding CHA while opening its membership to any public school and while also admitting other nongovernmental schools similarly situated to CHA.

CHA is entitled to appropriate declaratory and injunctive relief.

Respectfully submitted,

SIGNATURE OF COUNSEL

**WILLIAM D. (BILL) GRAVES**
OBA #3542
200 N. Harvey, Suite 500
Oklahoma City, OK 73102
Pho. (405) 235 5811
Fax: (405) 236 4114 and

**MICHEAL SALEM**  OBA #7876
*Salem Law Offices*
111 North Peters, Suite 100
Norman, Oklahoma 73069-7235
(405) 366-1234
(405) 366-8329 FAX

**CHRIS BOX**   OBA #2604
2208 S.W. 59
Oklahoma City, OK 73119
Pho. (405) 682 5544
Fax: (405) 682 5563

ATTORNEYS FOR PLAINTIFF
CHRISTIAN HERITAGE ACADEMY

35

## CERTIFICATE OF SERVICE

**This is to certify** that a true and correct copy of the above and foregoing instrument (including Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment and Supporting Four Volume Appendix) to which this certification is attached was mailed or served on

**Clyde A. Muchmore**
**Mark A. Grossman**
*Crowe & Dunlevy*
20 North Broadway, Suite 1800
Oklahoma City, Oklahoma  73102

this 5TH day of DECEMBER, 2003.

_____
**WILLIAM D. (BILL) GRAVES**

D:\WP51\CHA\SUM.JUDG\SUM.JUDG2.WPD